## Sahm *v.* Bair, Appellant.

*Replevin—Title to horse—Sale—Evidence—Case for jury.*

In an action of replevin for a horse where the defendant claims that he purchased the horse from a third person and paid for it, and the plaintiff claims that he had never parted title with the horse, that he had left the horse in the possession of the person with whom the defendant dealt under an agreement that the title should not pass until a stipulated price had been paid to the plaintiff for the horse and the third person testifies positively that he had bought the horse from the plaintiff and paid part of the purchase money, the case is for the jury on the conflicting testimony, and a verdict and judgment for plaintiff will be sustained.

Argued Nov. 12, 1913. Appeal, No. 162, Oct. T., 1913, by defendant, from judgment of C. P. Lancaster Co., Feb. T., 1913, No. 10, on verdict for plaintiff in case of Aaron S. Sahm v. John D. Bair. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Replevin for a horse. Before LANDIS, P. J.

At the trial the jury returned a verdict for plaintiff.

On rules for new trial and for judgment for defendant n. o. v., LANDIS, P. J., filed the following opinion:

The plaintiff was in the horse and livery business in the borough of Manheim. On the night of Friday, January 10, 1913, a young man by the name of Harvey Snyder, who lived about three miles distant from that place, telephoned to Sahm offering him a horse for sale. Sahm says: "I bought a horse from him through the telephone for $45.00," and that on the next day, he drove over to Snyder's to get the horse. Sahm was driving a horse of his own, and, when Snyder saw this horse, he said: "You got a nice horse hitched up here; what do you want for him?" Sahm says that he told Snyder he wanted $145, and that Snyder said he wished to drive back of the horse, and "so I (Sahm) gave him

a driving." Sahm testified that Snyder said he would take the horse, and that he had the cash money in the house. So they unhitched that horse, and hitched in the wagon the horse which Sahm had the day before bought from Snyder. Snyder then went into the house and came out in a few minutes and said that "he didn't have the money now," and he then said that he would come to Manheim in the afternoon and pay Sahm for the horse. But Sahm told him that he did not want to do business that way; that it was to be a cash sale; and Snyder then said: "Well, I would like to drive him a little, and I will be in, in the afternoon, and the horse will be yours until I pay for him." Sahm further testified: "The $145 horse was to be my horse until he was paid for, and he would come, in the afternoon, and pay for him," and "I left him there on trial." Snyder did not come to Manheim in the afternoon, and he never did come. Early on Monday morning, he sold the horse to the defendant for $75.00 and he received a check for that amount. Now, it is true that Snyder claimed that there was a trade between them, and that he was to give Sahm $100 to boot, and that he gave him $5.00 on account, and still owed him $95.00. But Sahm distinctly denied that there was any such arrangement, or that he received the $5.00. He said: "I did not trade horses;" that he "brought home the $45.00 horse" and "left with Harvey Snyder the $145. He was to give me $145 and I was to give him $45.00." Sahm stated that he still had the $45.00 horse, but he did not make any claim to him. It will be observed that, if this evidence is true, there was no conditional sale of the horse as contended for by the defendant. The $145 horse was never sold to Snyder; it was merely placed in his possession, and it was only to be sold to him when he paid the purchase price. This disputed fact went to the jury, and it has determined that the plaintiff's version of the transaction was the correct one.

Now, let us briefly turn to the charge of the court.

After stating the undisputed facts out of which the controversy arose, the court said: "And now comes the real point at issue between the parties. Sahm says that, after they had agreed upon a price for the Snyder horse, Snyder suggested that he (Sahm) had a good horse, and wanted to know the price; and Sahm told him that the price was $145; that Sahm drove Snyder behind the horse, and then Snyder agreed to take the horse, and said that he had the money in the house. Sahm says that Snyder went in the house, came out, and did not have the money, and then said to him that he would bring over the money to him in the afternoon; and Sahm said to him: "No, that won't do; I will not agree to that," and, after some talk between them it was arranged that the Sahm horse, for their convenience should remain at the place where Snyder lived, but that the title was not to pass; that the horse was to belong to Sahm until Snyder paid for him, and the whole arrangement, Sahm says, was that the deal was to be consummated, the purchase of the Snyder horse by Sahm and the purchase of the Sahm horse by Snyder were to be made, when Snyder came and paid the amount which was due on the Sahm horse. That, of course, was never done. Sahm says that Snyder never came that afternoon, and that he did not come the succeeding days; and on Monday, or shortly after that, he ascertained that the horse was at Blue Ball, and that then he commenced the proceedings to recover possession of the horse. Now, if you believe that that agreement was made between Sahm and Snyder, that the title was to remain in Sahm, it was Sahm's horse, and until he sold the horse to Snyder, of course, he had the title,—and if you believe that there was an arrangement between them that that horse was to be merely placed at Snyder's place of abode, but that the title was not to pass until it was paid for, then we say to you that Snyder had no right to sell that horse, because it was not his, and the law is, that a man cannot sell

and give title to what is not his own.  He has no right
to do that, and, if Snyder did that, then he could not
sell and pass a title to Bair, no matter whether Bair
did pay by the check.  That did not pass the title, pro-
vided the horse belonged to Sahm.  And, if Snyder did
that Sahm did not lose the right of possession to his
property, and he has a right, under such circumstances,
to recover.  No title passed to Bair by that kind of a
sale, if you believe that Sahm never sold or traded the
horse to Snyder.  Now, on the other hand,—and you
will equally consider that testimony, because the testi-
mony is contradictory here, and you have seen these
parties, and you will have to determine between them
which story you will believe,—on the other hand, Snyder
says that he and Sahm traded; that he gave Sahm his
horse, at $45.00 and took the Sahm horse and gave
Sahm $5.00 on account.  He says he owed him $95.00,
and that he has never paid that $95.00.  But he claims
that the sale was consummated at that time.  If there
was an actual trade between Sahm and Snyder, and de-
livery of possession was made by them in pursuance of
the trade, then the title of the Sahm horse passed to
Snyder, and the respective parties could give title to
the property which was thus delivered to them, not-
withstanding one of them had trusted the other to pay
some balance due upon the trade.  In other words, if
the whole transaction was consummated, then both of
them could sell the property traded and passed into the
respective possessions, and make title.  If this trade was
consummated as Snyder alleges, then Snyder had the
right to sell the Sahm horse to Bair, and if the jury
should find that this was the real state of the facts and
the situation of the parties, then the verdict should be
in favor of the defendant."

It seems to me that the defendant has no right to
complain of the presentation of the case.  His trouble
is, that the jury found adversely to his contention.
His reasoning that because Snyder obtained possession of

Sahm's horse, he could sell him and make title to an innocent purchaser, is not, in my judgment, sound. Upon the same theory, a thief could dispose of a stolen horse, and the real owner could not recover possession, because the purchaser had, in ignorance of the theft, paid value. If Sahm's story was true, and it must be so considered at this time, then Snyder was, at best, but a bailee of the horse, and he had no authority to dispose of him and make title to the defendant.

I am of the opinion that this case was fairly tried, and both of the rules should be discharged. Rules discharged.

*Error assigned* among others was in discharging rule for judgment for defendant n. o. v.

*Chas. W. Eaby*, for appellant.

*Wm. R. Brinton*, for appellee.

Opinion by Orlady, J., February 20, 1914:

The horse deal, at the foundation of this case differs from the average one, only in being somewhat more ingeniously arranged, but its solution depends on the credibility to be given the respective participants.

On the trial, the jury was instructed fully as to the rules of law applicable to the disputed facts, in a clear and adequate charge, and told, "The case practically rests upon whose testimony you will believe. Sahm testifies to a certain state of facts, under which if the jury find to be true, he ought to have a verdict. Snyder testifies to another state of facts, which if true, would entitle the defendant to a verdict, and the jury must decide between the testimony of the parties."

In the opinion filed by Landis, J., refusing a new trial the whole subject is carefully reviewed, and so satisfactory that it is not necessary to add anything thereto; for the reasons therein stated,

The judgment is affirmed.